**CITY OF SCRANTON**

v.

**FIRE FIGHTERS LOCAL UNION NO. 60, OF the INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL–CIO, Appellant.**

City of Scranton

v.

**Fire Fighters Local Union No. 60, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2008.

Decided Jan. 23, 2009.

Thomas W. Jennings and Stephen J. Holroyd, Philadelphia, for designated appellant, Fire Fighters Local Union No. 60.

Richard M. Goldberg, Kingston; Clifford B. Levine, Pittsburgh; and W. Timothy Barry, Pittsburgh, for appellee, City of Scranton.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and FRIEDMAN, Judge [1], and COHN JUBELIRER, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge SIMPSON.

## Table of Contents

| | | |
|---|---|---|
| I. | Background | 470 |
| II. | Arbitration Award | 471 |
| III. | Petition to Vacate or Modify | 473 |
| IV. | Issues on Appeal | 473 |
| | A. Section 252 of Act 47 | 474 |
| | B. Judicial Review | 475 |
| | 1. Scope of Review | 475 |
| | 2. Standard of Review | 476 |
| | 3. Available Remedies | 476 |
| | C. Unlawful Act | 477 |
| | 1. Amendment of Recovery Plan | 477 |
| | 2. Terms of Award | 478 |
| | a. Expiration of Recovery Plan | 478 |
| | b. Wages | 479 |
| | c. Health Care | 481 |
| | d. Staffing and Management | 483 |
| | i. Provisions of Award, Recovery Plan | 483 |
| | ii. Contentions | 485 |
| | iii. Management Positions, Paid Leave | 486 |
| | iv. Minimum Manning | 486 |
| | v. Managerial Rights | 487 |
| | e. Other Provisions of Recovery Plan Not Adopted | 487 |
| | 3. Waiver by Failure to Raise Arguments | 488 |

1. The decision in this case was reached before January 1, 2009, when Judge Friedman assumed the status of senior judge.

D. Illegality of Recovery Plan 489
 1. State Adverse Interest Act 489
 2. Recovery Plan Conflict with Act 111 489
E. Preclusion by Conduct 491
V. Conclusion 491

These appeals originating in an interest arbitration award involving public safety employees of a distressed municipality require this Court to again examine the effect of the Municipalities Financial Recovery Act (Act 47)[2] on collective bargaining rights under the statute known as the Policemen and Firemen Collective Bargaining Act (Act 111).[3]

In particular, the Fire Fighters Local Union No. 60 (Fire Fighters) appeals from two orders of the Court of Common pleas of Lackawanna County (common pleas court),[4] in favor of the City of Scranton (City) and its allied intervenors.[5] The first order, entered October 23, 2007, vacated unspecified provisions of an interest arbitration award between the Fire Fighters and the City because the award violated the City's 2002 Recovery Plan enacted under Act 47. The second order, entered January 15, 2008, attempted to clarify the first order by generally modifying the arbitration award "to incorporate the terms of the [2002] Recovery Plan, until the Recovery Plan is amended or the [City's] designation as 'distressed' under Act 47 is removed." Reproduced Record (R.R.) at 19a.

## I. Background

The largely uncontested history of this vigorous collective bargaining litigation has roots in 1992, when the City was determined to be financially distressed under Act 47. The Commonwealth of Pennsylvania, Department of Community and Economic Development (DCED) appointed an Act 47 Coordinator for the City. The Coordinator developed several financial recovery plans for the City. The third and most recent recovery plan was adopted in 2002 (2002 Recovery Plan), and it was overwhelmingly approved by referendum. The City remains a financially distressed municipality, and it continues to operate under Act 47 and the 2002 Recovery Plan.

Chapter I-B of the 2002 Recovery Plan is titled "CURRENT AND PROJECTED FINANCIAL OUTLOOK." It contains detailed estimates for essentially flat revenues and increasing expenditures from 2002 through 2007 under the prior administrations. The Plan concludes that in the absence of corrective action, the City faces sizeable and growing deficits, resulting in a cumulative deficit in 2007 of $7.21 million. R.R. at 77a.

Chapter II-A of the 2002 Recovery Plan is titled "OVERVIEW OF REVISED AND UPDATED RECOVERY PLAN FOR 2002, 2003, 2004, 2005, AND BEYOND." In this chapter the Act 47 Coordinator offers an overview of planned corrective action "for the period 2002, 2003, 2004, 2005 and beyond." R.R. at 171a. It contains detailed estimates of revenues and expenditures for 2003 through 2005

---

**2.** Act of July 10, 1987, P.L. 246, *as amended*, 53 P.S. §§ 11701.101–11701.501.

**3.** Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1–217.10.

**4.** The Honorable Harold A. Thomson, S.J. of Pike County, sat by designation.

**5.** The Commonwealth of Pennsylvania, Department of Community and Economic Development and the Act 47 Coordinator for the City of Scranton intervened before the common pleas court.

based on compliance with the 2002 Recovery Plan, resulting in no deficits. R.R. at 171a–72a.

Chapter II–B of the 2002 Recovery Plan is titled "LABOR RELATIONS, COST CONTAINMENT, AND RELATED PROVISIONS." It sets forth specific requirements for the City's employees. This section of the 2002 Recovery Plan states in part:

> However, to the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that the implementation of these cost containment provisions is mandatory. All costs containment provisions must be addressed. The only exception to the mandatory intent and nature of these provisions will be by amendment to said provisions, based upon approval from the Coordinator, in conjunction with the Pennsylvania Department of Community and Economic Development. Any such change must be in conformance with the financial parameters of the Recovery Plan.

R.R. at 190a (emphasis added). The chapter contains mandatory provisions applying to all City employees, R.R. at 190a–97a, provisions specifically for the fire employees, R.R. at 197a–200a, provisions specifically for the police, R.R. at 200a–205a, and provisions specifically for other employees.

## II. Arbitration Award

Pursuant to Act 111, the City and the Fire Fighters operate under a collective bargaining agreement (CBA). The last CBA expired as of December 31, 2002. Because collective bargaining for a new CBA reached an impasse, a panel of arbitrators was selected to render an arbitration award that would establish the terms and conditions of employment for fire personnel. A similar panel was selected to establish the terms and conditions for police.

After extensive hearings throughout 2003 and 2004, at which the impact of Act 47 and the 2002 Recovery Plan was hotly contested, and after more extensive deliberations, a divided arbitration panel issued an award regarding the Fire Fighters on May 30, 2006.[6] The award covered the period January 1, 2003 through December 31, 2007.

In the award, the panel majority acknowledged the City's status under the 2002 Recovery Plan but concluded that Fire Fighters wages and other benefits fell significantly below that paid to other fire fighters throughout the state. The majority was "convinced that the modifications to those wages and benefits set forth herein can be implemented, on balance, in concert with the [2002 Recovery] Plan...." R.R. at 22a. The majority believed "this Award is not violate [sic] of the Plan, but is in harmony with the Plan's objectives." Id. The panel majority awarded retroactive lump sum bonuses to all fire personnel of $1000 for 2003 and again for 2004, a retroactive lump sum bonus of $1250 for 2005, a salary increase of 5.5% as of the last day of 2005, a salary increase of 3.5% for 2006, and a salary increase of 4% for 2007. R.R. at 24a. Further, the majority adjusted health insurance deductibles and provided health benefits to fire personnel retiring after January 1, 2007 for five years. R.R. at 24a–26a. The majority opined that the changes will not violate the City's maximum health care costs permitted in Sec-

---

**6.** The award was not dated, and it was signed by the three arbitrators on different dates. On May 30, 2006, the independent arbitrator signed the award, comprising a majority of the panel with Fire Fighters' arbitrator.

tion II–B of the 2002 Recovery Plan. R.R. at 26a.

Separately, the panel majority expressed concern over the safety of Fire Fighters. Accordingly, the majority abolished the 150 person department limit in the previous CBA and replaced it with various manning requirements. R.R. at 26a–29a.

Finally, the panel majority determined that all other proposals for change submitted by the City and the Fire Fighters which were not expressly addressed were nevertheless considered and denied. R.R. at 29a.[7]

### III. Petition to Vacate or Modify

The next day, the City filed a petition to vacate or modify the award with the common pleas court. The Fire Fighters answered and raised new matter. At about the same time, the City filed a similar petition with regard to the parallel arbitration involving its police union. The common pleas court handled both petitions together. The court permitted intervention by DCED and the Act 47 Coordinator. After argument on both arbitration awards, and after deliberation, the common pleas court issued its first order, which vacated both arbitration awards.

The common pleas court summarized the positions of the parties, and it reviewed cases addressing the interplay between Act 47 and Act 111 collective bargaining.[8] Ultimately, the court concluded

the awards violated the 2002 Recovery Plan, and it generally vacated those award provisions, although the violations were not detailed. The court also rejected the Fire Fighters' argument that any violations of the 2002 Recovery Plan could be cured by plan amendment. The court concluded that under Section 249 of Act 47, 53 P.S. § 11701.249, the City cannot unilaterally amend the 2002 Recovery Plan; rather, the Act 47 Coordinator must initiate an amendment. To the extent the award required the City to amend the 2002 Recovery Plan, the award required the employer to perform an illegal act.

Thereafter, the City sought clarification of the first order. In response, the common pleas court issued its second order generally modifying the awards "to incorporate the terms of the [2002] Recovery Plan, until [the Plan] is amended or the [City's] designation as 'distressed' under Act 47 is removed." R.R. at 19a.

### IV. Issues on Appeal

The Fire Fighters appealed from each of the two common pleas court orders. Although Section 7(a) of Act 111, 43 P.S. § 217.7(a), states that no appeal shall be allowed to any court from the determination of a board of arbitration, courts have limited jurisdiction, in the form of narrow *certiorari*, to review arbitration awards. *City of Scranton v. Fire Fighters Local Union No. 60*, 923 A.2d 545 (Pa. Cmwlth.2007) (similar contentions about

---

7. There were two additional opinions, a concurring and dissenting opinion from the Fire Fighters' arbitrator (dissenting to some health insurance provisions in the award) and a dissenting opinion from the City's arbitrator (dissenting to the award in general as violating the 2002 Recovery Plan).

8. *City of Farrell v. Fraternal Order of Police Lodge No. 34*, 538 Pa. 75, 645 A.2d 1294 (1994) (Act 47 prohibits clear, specific recommendations of recovery plan from being vio-

lated, expanded or diminished); *Wilkinsburg Police Officers Ass'n v. Commonwealth*, 535 Pa. 425, 636 A.2d 134 (1993) (restrictions on collective bargaining embodied in Act 47 are constitutional); *Fraternal Order of Police, Fort Pitt Lodge No. 1 v. Yablonsky*, 867 A.2d 658 (Pa.Cmwlth.2005) (under Act 47, bargaining units continue to be protected by Act 111, but only to the extent that the bargaining does not interfere with the terms of the recovery plan).

grievance arbitration award based on CBA executed before 2002 Recovery Plan adopted). Thus, our review is limited to questions concerning: (1) the arbitrators' jurisdiction; (2) the regularity of the proceedings; (3) an excess of the arbitrators' powers; and (4) deprivation of constitutional rights. *Id.* An arbitrator who mandates that an illegal act be carried out exceeds his or her powers. *Id.*

Fire Fighters assign six primary errors in their main brief: 1) Section 252 of Act 47, 53 P.S. § 11701.252, does not by its terms apply to interest arbitration awards; 2) the court wandered beyond its narrow review; 3) the court erred by concluding the arbitration award required an unlawful act; 4) the court erred by giving any legal effect to the 2002 Recovery Plan, which is void because the Act 47 Coordinator violated the State Adverse Interest Act; [9] 5) the court erred by giving any legal effect to the 2002 Recovery Plan because by its inconsistent conduct the City is precluded from asserting the Plan against Fire Fighters; 6) rather than vacating the award, the appropriate remedy was remand to the arbitration panel.

In their reply brief, Fire Fighters assign several more primary errors: 7) the court erred by giving any legal effect to the 2002 Recovery Plan because many provisions are so inconsistent with the statutory right of collective bargaining as to render the entire Plan illegal as a matter of law; 8) Section 252 of Act 47 does not apply to various provisions of the 2002 Recovery Plan which are not economic in nature, so that the arbitration award may properly disregard them; and, 9) many of the City's assertions regarding conflict between the award and the 2002 Recovery Plan were not raised before the arbitrators and are therefore waived.

To the extent possible, we will address related issues together.

## A. Section 252 of Act 47

Section 252 of Act 47 provides: "A collective bargaining agreement or arbitration settlement executed after the adoption of a plan shall not in any manner violate, expand or diminish its provisions." 53 P.S. § 11701.252. This provision is a limitation on the statutory rights to collective bargaining by public safety personnel. *Wilkinsburg Police Officers Ass'n v. Commonwealth,* 535 Pa. 425, 636 A.2d 134 (1993). The limitation does not violate the Pennsylvania constitution. *Id.*

Fire Fighters contend this provision does not apply to interest arbitration awards, such as the award in this case. They assert the common pleas court erred when it applied the provision here. More particularly, Fire Fighters argue that by its plain terms Section 252 applies only to CBAs and arbitration settlements after the execution of a recovery plan. Because the provision does not contain the word "award," it should not be construed as applying to awards. They contrast agreements and settlements, which connote voluntary undertakings, with awards, which arise when the parties fail to reach an agreement. Fire Fighters also point to other labor statutes which specifically address arbitration awards, arguing that the absence of the term here demonstrates the General Assembly's intent that Section 252 not apply to arbitration awards.

In contrast, the City primarily relies on case law addressing Section 252 and specifically rejecting an identical argument. *Pittsburgh Fire Fighters, Local No. 1 ex rel. King v. Yablonsky,* 867 A.2d 666, 671 (Pa.Cmwlth.2005) (*en banc*) (in Section 252 of Act 47, General Assembly was referring to arbitration awards, whether it used the word settlement or determination) (*Fire*

9. Act of July 19,1957, P.L. 1017, *as amended,* 71 P.S. §§ 776.1–776.8.

*Fighters v. Yablonsky*); *see City of Farrell v. Fraternal Order of Police Lodge No. 34,* 538 Pa. 75, 645 A.2d 1294 (1994) (after recounting lower courts' decisions referring to Section 252's effect on arbitration awards, Court applied Section 252 to interest arbitration award); *Wilkinsburg,* 535 Pa. at 435, 636 A.2d at 139 (even if section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards, it would not violate the Pennsylvania Constitution); *Fraternal Order of Police, Fort Pitt Lodge No. 1 v. Yablonsky,* 867 A.2d 658 (Pa.Cmwlth.2005) (*en banc*) (Section 252 of Act 47 is express limitation on collective bargaining process) (*FOP v. Yablonsky*). Further, noting the General Assembly's failure to amend Section 252 in the 14 years after the Supreme Court's application of it to an interest arbitration award in *City of Farrell,* the City urges a presumption that the decision is consistent with legislative intent.

As to the plain language of Section 252, the City posits that the language is intended to limit the actions of a distressed municipality. Thus, Section 252 makes it unlawful for a distressed municipality to voluntarily violate or diminish an existing recovery plan during collective bargaining. Because an arbitration award may only require a public employer to do that which it could do voluntarily, Section 252 thereby limits arbitration awards even though the word "award" is not present in the text.

In reply, Fire Fighters argue that the purposes of Act 47 do not include the nullification of the duty to bargain under Act 111. Relying on the same cases, Fire Fighters contend that Act 111 is merely limited by Act 47, not erased or overturned by it. Further, Fire Fighters passionately argue that the City's interpretation of Section 252 would allow it to dictate the terms of collective bargaining agreements, a result supported by neither the language of Act 47 nor labor law.

■ We discern no error in the decision of the common pleas court to apply Section 252 of Act 47 to this interest arbitration award. The court's decision was consistent with this Court's *en banc* holding in *Fire Fighters v. Yablonsky,* which specifically rejected a very similar argument. Moreover, the court's decision is consistent with this Court's recent holding in *Borough of Greenville v. International Association of Firefighters Local 1976,* 952 A.2d 700 (Pa.Cmwlth.2008) (Section 252 of Act 47 applied to interest arbitration award involving fire fighters). Further, there is no language in the Supreme Court's decisions in *City of Farrell* and *Wilkinsburg* that compels a different conclusion.

■ We accept the City's reading of the plain language of Section 252: the statutory provision acts to prohibit a distressed municipal employer from voluntarily making concessions during collective bargaining which violate or diminish a recovery plan under Act 47. This express prohibition has an effect on interest arbitration awards, whether or not the term "award" is present in the text. This is because of the long-standing rule that an arbitration award may only require a public employer to do that which it could do voluntarily. *Washington Arbitration Case,* 436 Pa. 168, 259 A.2d 437 (1969). When an arbitration award goes beyond this limitation, it may be reviewed under the narrow *certiorari* standard for excess of the arbitrators' powers. *FOP v. Yablonsky.*

■ In rebuttal to charts appended to the City's brief detailing numerous failures of the award to include provisions of the 2002 Recovery Plan, Fire Fighters argue that Act 47 was intended to only apply to economic terms of public employment; therefore, several provisions of the Plan which are not economic in nature are not entitled to deference under Section 252. Fire Fighters rely on the legislative intent

stated in Act 47, 53 P.S. § 11701.102, and on the criteria for evaluating a municipality's financial stability set forth in Section 241 of Act 47, 53 P.S. § 11701.241. Without identifying the specific provisions of the 2002 Recovery Plan of which they complain, Fire Fighters refer to the requirements that employees submit doctors' notes,[10] changes in the grievance procedures which require more specificity,[11] and requirements that employees record leave time on an absence report copied to the department director.[12]

Section 241 of Act 47 specifies the contents of a recovery plan. The section empowers the Act 47 Plan Coordinator to formulate a recovery plan which shall include any of the enumerated factors as relevant to alleviate financially distressed status, including possible changes in collective bargaining agreements and permanent and temporary staffing level changes or changes in organization. 53 P.S.

§ 11701.241(3). This enabling language contains no further qualification.

We reject Fire Fighters' argument on this issue. Having reviewed the 2002 Recovery Plan in its entirety, we are satisfied that all its provisions bear some rational relationship to cost containment and improved efficiency. The provisions generally referenced by Fire Fighters relate to discovering and controlling leave abuse and to reducing administrative time and professional costs incurred in determining the nature of vague grievances. In the absence of express statutory limitation, there is no legal basis to distinguish between economic provisions and administrative provisions of the 2002 Recovery Plan.

### B. Judicial Review

#### 1. Scope of Review

As stated above, the scope of review of an Act 111 arbitration award is in the

---

**10.** Fire Fighters apparently refer to Section II–B (12) of the 2002 Recovery Plan, titled *"Sick Leave/Doctors['] Evaluation,"* which provides:

> Any employee who is off work as a result of any illness or injury *for more than three consecutive work days or who exhibits a pattern of possible sick leave* abuse shall be required to furnish, at the employee's expense, a doctor's certification concerning the nature of the illness or injury. In addition, the City may, at its discretion, order an evaluation of the employee's condition by medical personnel of the City's choosing at the City's expense.

R.R. at 195a (emphasis added). This provision was described in testimony before the arbitration panel. R.R. at 4721a.

**11.** Fire Fighters apparently refer to Section II–B (17) of the 2002 Recovery Plan, titled *"Grievance Procedures,"* which provides:

> *All grievance procedures in any collective bargaining agreement shall be amended to include* a provision that requires the following as part of the initial filing of any grievance:
> a. *Specific* identification of nature and all details concerning the grievance in question.

b. *Specific* identification of the section of the collective bargaining agreement which has been violated.
c. *Specific* remedy requested including the section of the collective bargaining agreement which authorizes the remedy requested.
d. The grievance must be filed within a 7–day period following the first occurrence giving rise to the grievance.
The City will have no duty to process or arbitrate any grievance which does not comply with these requirements.

R.R. at 196a (emphasis added). This provision was described in testimony before the arbitration panel. R.R. at 4722a.

**12.** Fire Fighters apparently refer to Section II–B (20), titled *"Absence Report,"* which provides as follows: "Employees must record any vacation, sick personal, jury, or bereavement leaves on an Absence Report form and submit a copy to the Department Director." R.R. at 197a. This provision was described in testimony before the arbitration panel. R.R. at 409a–11a.

nature of narrow *certiorari*. However, one of the elements of such review is for excesses in the exercise of the arbitrators' powers, such as requiring an illegal act or an act which a municipality may not do voluntarily. *Washington Arbitration Case; FOP v. Yablonsky*. We discern no error in the common pleas court's review of the award to determine whether it compelled the City to act in a manner proscribed by Act 47 or whether it required the City to do something it could not do voluntarily.

### 2. Standard of Review

■ As to the standard of review, courts afford deference to Act 111 arbitrators' findings of fact, but review of questions of law within the elements of narrow *certiorari* is non-deferential. *Town of McCandless v. McCandless Police Officers Ass'n*, 587 Pa. 525, 901 A.2d 991 (2006) (unless determination depends on arbitral fact-finding or construction of CBA, no reason why court should defer to arbitrator on questions of whether there was an excess of the arbitrator's powers).

■ The panel majority here opined that their award does not violate the 2002 Recovery Plan, but is in harmony with the Plan's objectives. R.R. at 22a. The panel majority also stated that the award's "increase in wages do not exceed the increase in costs permitted under Chapter II–B of the Plan," R.R. at 24a, and that "the record does not indicate that the [health insurance provisions of the award] will violate the City's maximum health care costs permitted by Section II–B of the Plan." R.R. at 26a. These statements are not based on findings of evidentiary fact; rather, they involve a question of law within our narrow scope of review for excess of arbitrators' powers. As such, the statements are not entitled to deference. *Town*

of *McCandless*; *cf. City of Farrell* (distinction between specific recovery plan recommendations and general assumptions).

### 3. Available Remedies

The parties raise challenging arguments on the question of how to remedy an Act 111 interest arbitration award that is determined to violate an Act 47 recovery plan.

Fire Fighters remind us the General Assembly intended there to be minimal, if any, judicial interference with the Act 111 arbitration process. Should a court decide that an interest arbitration award runs afoul of an Act 47 recovery plan, the award should be sent back to the arbitration panel with instructions for modification. Otherwise, a reviewing court would become a "super arbitrator." Conversely, the City argues that the arbitration panel lacks authority to modify its decision.

The authority of the common pleas court to vacate an arbitration award under certain conditions is founded in statutory and common law. The Uniform Arbitration Act [13] applies to collective bargaining agreements to arbitrate where the arbitration is consistent with any statute regulating labor and management relations. 42 Pa.C.S. §§ 7302(b), (d); Bar Association Comment (subsection d is intended to preserve without change the scope of review which presently exists over awards of arbitrators such as those appointed under Act 111). The Uniform Arbitration Act expressly permits a court to vacate an arbitration award where the arbitrators exceeded their powers. 42 Pa.C.S. § 7314(a)(1)(iii). Also, the Uniform Arbitration Act allows a court to modify an arbitration award under certain circum-

---

**13.** 42 Pa.C.S. §§ 7301–7320.

stances. 42 Pa.C.S. §§ 7302(d), 7315. These statutory authorizations to common pleas courts are consistent with long-standing direction from our Supreme Court:

> In the instant case the adjudicatory power is an arbitration panel. Since it is a creature of the Legislature we must look to see if its powers were restricted in any way. If they were, and *if the panel went beyond the limits of its authority, then it committed an excess in the exercise of power and the tainted portions of its mandate may be reviewed and corrected.*

*Washington Arbitration Case,* 436 Pa. at 174–75, 259 A.2d at 441 (emphasis added).

 Neither legal error nor abuse of discretion is evident in the common pleas court's decision to vacate and modify the award without remand to the arbitrators. As to legal error, the common pleas court's action is authorized by the Uniform Arbitration Act and by Supreme Court precedent. As to the court's decision to modify by itself rather than to remand, no abuse of discretion is present. Given the unconscionable delay during the arbitration process and the parties' unwillingness to streamline the issues for review, the common pleas court had good reason to decline the "start-from-scratch" approach to modification.

In sum, while we respect the need for judicial restraint in a court's limited review of Act 111 arbitration awards, we discern no error in the breadth or manner of the common pleas court's review here.

Similarly, authority for this Court's appellate review of the orders of the common pleas court is also set by statute. "An appellate court may affirm, *modify,* vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances." 42 Pa.C.S. § 706 (emphasis added).

Therefore, we may modify the orders of the common pleas court. As noted above, the court issued its first order vacating award provisions which violated the 2002 Recovery Plan. Unfortunately, the court never specified which award provisions were vacated. Also, the court issued its second order generally modifying the arbitration award to incorporate the terms of the 2002 Recovery Plan. The court, however, never explained how the incorporation of the Recovery Plan into the award was to be accomplished. To the extent necessary to clarify the relations between the parties, we will modify the orders of the common pleas court, as discussed more fully below.

### C. Unlawful Act

Fire Fighters argue that the award does not require an unlawful act necessitating its vacation.

### 1. Amendment of Recovery Plan

Fire Fighters assert the City can voluntarily amend the 2002 Recovery Plan to bring the award into compliance with the plan. Also, relying on language in Act 111, they argue that an interest arbitration award is a mandate compelling a municipality to take legislative action such as amending the Recovery Plan. 43 P.S. § 217.7(a) (determination by arbitration panel shall constitute mandate to appropriate body to take action necessary to carry out award); *see Washington Arbitration Case* (public employer may not hide behind self-imposed legal restrictions; if award requires affirmative action by legislative body it must take such action if within its power).

The City contends that under Act 47 only the entity that developed the recovery plan has the authority to initiate amend-

ments to it. Because the Act 47 Coordinator developed the 2002 Recovery Plan here, only the Act 47 Coordinator, not the City, may initiate amendments to it.

Further, the terms of the 2002 Recovery Plan make clear that amendments must be "based upon the approval of the [Act 47] Coordinator in conjunction with [DCED]." Chapter II–B Prologue, R.R. at 190a. Additionally, "[a]ny such change must be in conformance with the financial parameters of the Recovery Plan." Id.

The City asserts that Fire Fighters' contentions on this issue are untrue and would undermine the central intent of Act 47. It also asserts that because the award here deviates from the 2002 Recovery Plan, directing the City to comply with the award and demanding the City amend the Recovery Plan to conform to the award would be an order to perform an act which the City is prohibited from performing.

Section 221 of Act 47, 53 P.S. § 11701.221, empowers the coordinator to prepare and administer a recovery plan. The contents of a coordinator's recovery plan are specified in Section 241 of Act 47, 53 P.S. § 11701.241. Neither DCED nor the governing body may revise the coordinator's recovery plan, but the coordinator, after consultation with DCED and the distressed municipality, may revise the plan. Section 244 of Act 47, 53 P.S. § 11701.244. Thereafter, the municipality may adopt or reject the coordinator's recovery plan. Section 245 of Act 47, 53 P.S. § 11701.245.

If the coordinator's recovery plan is not adopted, the municipality must prepare and take action on an alternate plan. Section 246 of Act 47, 53 P.S. § 11701.246. DCED must also review and approve the alternate recovery plan. Id.

Section 247 of Act 47, 53 P.S. § 11701.247, addresses implementation of the recovery plan. Separate provisions exist for implementation of a coordinator's recovery plan and for a municipality's alternate recovery plan.

Section 249 of Act 47, 53 P.S. § 11701.249, provides: "An amendment to an adopted plan may be initiated by the coordinator, the chief executive officer or the governing body of a municipality, as the case may be . . . ."

Viewed in the context of all the provisions just discussed, we conclude that the party who developed the recovery plan at issue is empowered to initiate an amendment of its recovery plan. Where, as here, the coordinator's recovery plan was adopted, the coordinator is the one empowered to initiate any amendment. Conversely, where the coordinator's recovery plan was adopted, the municipality is not empowered to initiate amendment of the plan. Accordingly, we discern no error in the common pleas court's conclusion that the City here could not unilaterally amend the 2002 Recovery Plan to comply with the arbitration award.

Similarly, we reject the argument that the Act 111 arbitration award constitutes a mandate to the City to amend the 2002 Recovery Plan. Operating under the Plan Coordinator's Recovery Plan, the City simply lacks the authority to do so. There is nothing in Act 111 which empowers a distressed municipality to take action which is contrary to positive law.

### 2. Terms of Award

Fire Fighters contend the award does not violate, expand or diminish the 2002 Recovery Plan, for several reasons.

### a. Expiration of Recovery Plan

Fire Fighters argue that the 2002 Recovery Plan expired by its terms on December 31, 2005. Thus, the Plan does not restrain any award provisions effective after that date.

The City contends the 2002 Recovery Plan did not expire; rather, by its terms it continues in full force and effect. The City highlights Plan language addressing "the period 2002, 2003, 2004, 2005 *and beyond*," R.R. at 171a (emphasis added), and the Plan's fiscal projections which extend through 2007.

Also, the City reminds us that its distressed status continues. Under these circumstances, the terms of the Recovery Plan must remain in effect until either the City's status is changed or the Plan is superseded by another recovery plan. Such a conclusion is compelled by the purpose behind Act 47, for a distressed municipality such as the City to reach fiscal recovery.

As to the specific directives for wages and benefits in some years but not in others, the City argues mandatory provisions of the Recovery Plan should not be avoided by protracted litigation. Rather, the provisions should continue in effect. The City relies on *Pennsylvania State Park Officers Ass'n v. Pennsylvania Labor Relations Board*, 854 A.2d 674 (Pa. Cmwlth.2004), and similar cases requiring the maintenance of status quo during collective bargaining after the expiration of a CBA.

We reject the contentions of both parties. Instead, we analyze the plain language of each contested provision of the 2002 Recovery Plan to determine its effective dates. The Plan expressly includes "labor relations, cost containment and related provisions" for "the remainder of 2002 as well as the period 2003–2005 and beyond." As discussed more fully below, we conclude that some provisions apply in certain years, while other provisions contain no limit to their duration.

### b. Wages

The arbitration panel majority made the following award of wages:

*Wages.*

Within 45 days of the execution of this Award by at least a majority of the Panel, all bargaining unit members who are on the payroll on the corresponding dates listed below shall receive wage increases of bonuses in accordance with the following:

| | |
|---|---|
| January 1, 2003 | $1000 lump sum bonus. |
| January 1, 2004 | $1000 lump sum bonus. |
| January 1, 2005 | $1250 lump sum bonus. |
| December 31, 2005 | 5.5% increase across the board. |
| January 1, 2006 | 3.5% increase across the board. |
| January 1, 2007 | 4.0% increase across the board. |

The Panel notes these increases are the same as awarded in the Police Award and a majority of the Panel believe that these increases do not exceed the increase in costs permitted under Chapter II–B of the Plan.

R.R. at 24a.

By comparison, Sections II–B (2), (3) of the 2002 Recovery Plan provide:

2. *Wages. For 2003, 2004, and 2005, the base hourly wages and salaries of all City employees shall not exceed existing (2002) rates*, except to the extent that future collective bargaining agreements, arbitration awards, or other means result in using the moneys made available in Item 3 below for wage increases. (As of the adoption of this plan, the City's DPW employees are negotiating with the City for the year 2002. Should the bargaining unit and the City come to an agreement on wages for 2002, such rates shall be considered the 2002 rate for these employees.)

3. *Personnel Costs. For 2003 a total of $225,000* will be available to meet any adjustments in personnel-related costs for all City employees, including those costs resulting from collective bargaining, arbitration, and/or other means; *for 2004 a total of $400,000* will be available to meet the costs of any such adjust-

ments; and *for 2005 a total of $605,435 will be available.* Distribution of these moneys among the various departments/bargaining units shall be fair and equitable and shall generally be in proportion to the actual 2001 costs incurred for each department/bargaining unit. Uses of these moneys could include one-time bonuses, wage adjustments, offsets against medical co-pays, etc. as determined by collective bargaining, arbitration, or other means. *Whatever the terms of future collective bargaining agreements, arbitration awards, etc., no back wages or other retroactive adjustments shall be paid.*

R.R. at 191a (emphasis added).

Fire Fighters argue the wage provisions of the award compare favorably to the Recovery Plan provisions, citing the panel majority's finding in that regard.

Fire Fighters acknowledge the following Recovery Plan provision relating to retroactive wages: "Whatever the terms of future collective bargaining agreements, arbitration awards, etc., no back wages or other retroactive adjustments shall be paid." Section II–B (3), R.R. at 191a. They contend, however, that the lump sum bonuses awarded for 2003, 2004, and 2005 could be awarded in the May 30, 2006 award because they are not back wages or wage adjustments; rather, they are payments in lieu of wages. Similarly, they contend that despite the prohibition against retroactive adjustments, the December 31, 2005 wage increase could be awarded in the May 30, 2006 award because it was effective for only one day of the Recovery Plan's existence and was therefore *de minimis.*

The City contends the award of annual bonuses for 2003, 2004 and 2005 salary increases for 2005, 2006 and 2007 violates the Recovery Plan by exceeding the wages and salaries permitted under Section II–B

(2) of the Plan, titled *"Wages."* The City further contends the award of bonuses and salaries exceeds the budgeted adjustments for personnel costs and violates the prohibition against retroactive adjustments set forth in Section II–B (3) of the Recovery Plan, titled *"Personnel Costs."*

We conclude that the May 30, 2006 award violates Section II–B (3) of the 2002 Recovery plan because it awards back wages or retroactive adjustments for 2003, 2004, 2005 and part of 2006.

We reject Fire Fighters' argument that the prohibition against back wages clause in the *"Personnel Costs"* provision lapsed. The plain language of the provision does not support that argument. Although some clauses of that provision are effective for specific years, there is no such limitation on the back wage clause. Further, we reject the argument that these items are something other than wages. Indeed, the award itself describes them as *"Wages"* and "wage increases." R.R. at 24a.

We reject the City's contention that the specific year wage limitations and total adjustment limits remain in effect indefinitely. The plain language of the provisions does not support the argument. Rather, the plain language of the 2002 Recovery Plan indicates that the wage limitations and total personnel cost adjustments apply in years 2003, 2004 and 2005 only. Because an award of wage increases of 3.5% in 2006 and 4.0% in 2007 does not conflict with a clear, specific provision of the 2002 Recovery Plan, the wage increases may be awarded prospectively. *City of Farrell* (Act 47 prohibits clear, specific recommendations of recovery plan from being violated, expended or diminished).

As a result of our conclusion, the court orders are modified to expressly vacate bonuses for 2003, 2004, and 2005, to vacate the 5.5% wage increase effective December

31, 2005, and to make the 3.5% wage increase effective the date of the award, May 30, 2006. The wage increase of 4.0% effective January 1, 2007 is confirmed.

### c. Health Care

The arbitration panel majority made the following award regarding health care:

*Health Insurance.*

A. The City is ordered to fully cooperate with the Health Care Committee by providing all information reasonably necessary to its function and by cooperating with the National Health Care Consultant in the Committee's efforts to contain health care costs.

B. Effective 30 days after the issuance of this award, the applicable deductibles and/or copayments shall be adjusted as follows:

1. The maximum individual annual deductible under the medical insurance plan shall be increased from $200 to $400 for in-network and out-of-network.

2. The maximum family annual deductible shall be increased from $400 to $800 for in net work and out-of-network.

3. The per-visit emergency room co-pay shall be increased from $35 to $75.

4. The per-visit doctor co-pay shall be increased from $5 to $10.

5. The co-payment for the prescription plan shall be increased to $6 for generics and $15 for brand name drugs.

C. Article XV, Sections 3(A) and (B) of the collective bargaining agreement shall be amended as follows:

1. Effective January 1, 2003, the City shall be liable for the cost of health insurance (over and above the listed deductibles and co-payments) up to the annual amounts listed below:

| | |
|---|---|
| Single Coverage | $3,692 |
| Parent/Child | $7,298 |
| Parent/Children | $7,869 |
| Husband/Wife | $9,261 |
| Family | $9,933 |

2. As of January 1, 2004, the City shall be responsible for 50% of any increases in the cost of health care for active bargaining unit employees beyond that provided above and the active employees shall be responsible for the balance of any subsequent increases as determined by the healthcare provider.

D. Retiree Health Insurance shall be amended as follows: *Effective January 1, 2007, all bargaining unit members who thereafter retire and are eligible to receive retiree health insurance under the 1996–2002 Agreement shall continue to be eligible to receive insurance for a period of 5 years following the bargaining unit member's retirement.*

The Panel notes that these provisions are congruent with the health care provisions in the Police Award. Further, a majority of the Panel believes that the record does not indicate the above provisions will violate the City's maximum health care costs permitted by Section II–B of the Plan.

R.R. at 24a–26a (emphasis added).

By comparison, Section II–B (5) of the 2002 Recovery Plan provides:

*Health Insurance Benefits. Beginning January 1, 2003, the maximum annual dollar amount which the City will pay to meet all health care costs of any nature shall be $7,191,812 (equal to the City's actual 2001 cost). This amount shall meet all costs relating, but not limited to, medical and major medical, dental, vision, and prescription coverages; administrative costs; and cash payments to individuals that opt not to re-*

ceive City health benefits and apply to all eligible current employees and their eligible dependents and eligible former employees and their eligible dependents. The allocation of this amount to cover eligible recipients shall be fair and equitable and shall generally be in proportion to the actual 2001 costs incurred for each department/bargaining unit.

The specific health benefits and coverage for eligible employees, retirees, and dependents shall be determined by the Healthcare Committee.

*Effective January 1, 2003, the City will cease to extend health care benefits to employees who retire on or after that date.*

R.R. at 192a–93a (emphasis added).

Fire Fighters point out that the Recovery Plan does not prohibit increases in the City's obligations; rather, the Plan places a cap on the total amount for each year. Thus, the fact that there was an increase in the City's obligations is not dispositive in determining whether the award violates the Recovery Plan. Fire Fighters declare that the record lacks evidence that the award caused the City to expend money in excess of the cap in any year.[14]

The City asserts the Health Insurance provision of the award violates the 2002 Recovery Plan in several ways. It exceeds the budgeted adjustments for health care related costs under Section II–B (5) of the Plan. Also, the award allows fire fighters to retire with lifetime health care benefits,

contrary to the provision in the same section of the Recovery Plan, which proclaims such benefits will cease for employees retiring after January 1, 2003, the effective date of the Plan.

■ We conclude the award violates Section II–B (5) of the 2002 Recovery Plan because it allows fire fighters to retire after January 1, 2007 with health care benefits for five years. This will be discussed more fully below.

We reject Fire Fighters' argument that the cessation of health care benefits for those retiring after January 1, 2003 lapsed. There is nothing in the plain language of the provision which places limitations on the duration of the Recovery Plan's "Health Insurance Benefits" provisions.

■ We reject the City's assertion that the health care provisions of the award violate the annual maximum health care costs clause. This broad assertion is not supported by the record or clarified by argument. Indeed, the City fails to quantify the claimed excess or to explain how it might be ascertained.

As a result of our conclusion, the common pleas court orders are modified to vacate paragraph 3(D) and to substitute the following language reflective of Section II–B (5) of the 2002 Recovery Plan: "Effective January 23, 2009, the City will cease to extend health care benefits to employees who retire on or after that date."[15]

---

14. Fire Fighters acknowledge the following provision in the 2002 Recovery Plan related to health care costs: "The allocation of [the maximum annual dollar amount to meet health care costs] shall be fair and equitable and shall generally be in proportion to the actual 2001 costs incurred for each department/bargaining unit." Section II–B (5), R.R. at 192a–93a. They assert, however, no evidence demonstrates that the admitted increase in the health care obligation to the Fire Fighters was not fair and equitable. They

further contend that the proportionality language is in the nature of non-binding recommendation rather than a mandatory directive, and they rely on *City of Farrell.*

The City does not assert that the award violated the proportionality language; therefore, we need not address this issue.

15. The prospective nature of this modification results from the concern for retroactive changes in retirement benefits for Fire Fight-

### d. Staffing and Management

### i. Provisions of Award, Recovery Plan

As part of its award, the arbitration

ers who retired during the prolonged litigation, as discussed more fully below.

**16.** The actual item awarded is as follows (R.R. at 26a–29a) (emphasis added):

*Fire Fighter Safety.*
In recognition that the one hundred fifty fire fighter "floor," regarding the entire workforce complement, in the previous contract cannot be continued without concurrence by the City and in recognition of the City's decision not to so concur, the Panel acknowledges that the "floor" will be deleted from the contract. As implied above, a majority of the Panel is convinced from the evidence of record that there is a direct and irrefutable connection between the lives and safety of the fire fighters and the number of personnel actually assigned to fire apparatus that the City determines to operate. In that regard, it would appear that the NFPA 1710 standards developed by a nationally-renowned body of experts to which the City belongs provides the scientifically-sound and persuasive guidance on this vital issue. As further indicated above, the Panel recognizes that the City's finances and the terms of the Plan cannot achieve the NFPA standards in their entirety.
Accordingly, *the Panel directs the following as being the minimal necessary staffing to protect the safety and lives of the bargaining unit:*
Effective immediately, the portion of Article XIX, Section 3 of the collective bargaining agreement that provides "Except as otherwise provided in this Agreement, the bargaining unit complement shall at all times be maintained at not less than One Hundred Fifty (150) bargaining unit members" shall be deleted and shall be replaced with the following language:
1. *Each engine company maintained by the City shall be actually staffed on each shift with no less than three (3) personnel.*
2. *Each truck company maintained by the City shall be actually staffed on each shift with no less than three (3) personnel.*
3. *The Rescue Unit shall actually be staffed on each shift with no less than three (3) personnel.*

panel majority directed implementation of "the minimal necessary staffing to protect the safety and lives of the bargaining unit." R.R. at 27a.[16]

4. If the City determines to utilize an apparatus as a Quint (a combination ladder and engine apparatus) and merges into a single engine company and single truck company into one Quint company, *it shall actually be staffed with no less than five (5) personnel.*
5. *The number of pieces of apparatus and fire companies maintained by the City is left to its discretion. However, if the City temporarily or permanently closes more than three companies at the same time, the minimum manpower per apparatus provided above shall be increased for engines, trucks and Rescue from three to four personnel.* Although nothing in this provision shall nullify the City's obligation to pay overtime, this provision is neither intended to create overtime or any other additional costs to the City. Rather, the sole purpose of this provision is to ensure that there is a safe level of manning at fires if the City temporarily or permanently closes more than three fire companies, *and the provision is not intended to create a minimum number of fire fighters in the bargaining unit or require the City to hire additional fire fighters.* Should the parties not agree on whether the City has closed a company, the panel named above shall make a determination whether it has been closed or not.
6. To accomplish the foregoing and to minimize the impact upon the City's finances, it is imperative that as many personnel as possible be assigned to fire suppression. Therefore, the Master Mechanic position may be eliminated and the personnel in that position will assume fire fighting suppression responsibility. *Further, the City shall have the right to implement a "three-shift" schedule in which firefighters engaged in fire suppression would work twenty-four hours followed by forty-eight hours off.* All regularly scheduled hours of work required by such schedule shall be paid at the hourly straight-time rate. By the use of "Kelly Days" and an appropriate work cycle under the Fair Labor Standards Act (FLSA) this schedule will not generate overtime under the Collective Bargaining Agreement or the FLSA to the extent it and

By comparison, Section II–B (7) of the 2002 Recovery Plan, titled *"Elimination of Minimum Manning,"* provides that minimum manning requirements "shall be eliminated," and "[t]he City shall have the sole right to determine the number of personnel employed and utilized by the City." R.R. at 194a.

Moreover, Section II–B (2), Provisions Specifically for the Fire Department of the 2002 Recovery Plan provides:

> *Management Positions.* The City shall create new job descriptions for the following existing management positions within the Fire Department: the Chief, *Deputy Chief,* Administrative Captain, and Assistant Chiefs. Said management positions shall be given supervisory and decision-making authority including, but not limited to, involvement in collective bargaining proposals and labor relations matters on behalf of the City. Said management positions shall be excluded from the applicable bargaining unit. *The City shall file a unit clarification petition with the Pennsylvania Labor Relations Board in order to exclude said management positions from the bargaining unit, if necessary.* These positions shall no longer be eligible for overtime compensation, compensatory time, or longevity pay.

R.R. at 199a (emphasis added).

In addition, Section II–B (1) of the 2002 Recovery Plan provides:

> *Management Rights. The City shall have the right to determine the organizational structure of each Department including, but not limited to, the right to determine and change job duties for each position, the right to determine and change schedules for each employee, and the right to assign work to any employee.* Any provision in any collective bargaining agreement which is inconsistent with, or which interferes with, the rights of the City as set forth above, shall be eliminated to the extent of such inconsistency or interference, and the City's management rights, as set forth above, shall not be the subject of any grievance procedure or arbitration clause in any collective bargaining agreement between the City and any of its unions.

R.R. at 190a–91a (emphasis added). Also, Section II–B (1), Provisions Specifically for the Fire Department, provides:

> *Organization and Scheduling. The City shall reorganize its Fire Department in order to more efficiently deploy fire personnel.*
>
> *The provisions of the current collective bargaining agreement between the City and the International Association of Firefighters relating to the fire study task force and the study of the location of fire stations* (Article VII, Paragraph 2), *the reduction of force pending receipt of the study* (Article VII, Paragraph 3) *and the payment of damages for arbitration awards resulting from the Union's claim for overtime* (Article VIII, Paragraph 5) *shall be deleted from the collective bargaining agreement. All of these issues and matters are reserved to the City's management right to decide the organization, structure and operations of the Fire Department including, but not limited to, the number and location of fire stations, the temporary and permanent closing of fire stations and*

---

its regulations apply to municipal fire departments.

7. *If the foregoing staffing is maintained, the maximum amount of personnel on leave*

*(holiday and vacation leave) will be reduced from 4 to 3 on a holiday and from 5 to 4 on vacation.*

*companies, and the authorization and scheduling of overtime.*

Under the Fair Labor Standards Act, overtime for firefighters is legally distinct from overtime requirements for other non-exempt employees. Under the Fair Labor Standards Act, the City is not required to pay overtime to firefighters unless they work more than 212 hours within a 28 day period or cycle (53 hours average per week). Presently, firefighters work an average of 42 hours per week.

*Effective January 1, 2003, the present four-shift schedule shall be changed to a three-shift schedule,* thus allowing for a greater pool of firefighters per shift. The workweek shall consist of not more than 49 hours of work, paid at straight time in accordance with the Fair Labor Standards Act, and at the existing annual firefighter salary. The schedule shall provide for three shifts with each shift working 2 days (10 hours per day) and then 2 nights (14 hours per night) followed by 2 days off. Kelly Days (additional days off) will be utilized so that the average workweek for each firefighter will not exceed 49 hours. This schedule is modeled after the schedule previously used in the City of Scranton.

Except for the Assistant Chief and his driver, *the City shall provide for a minimum of three firefighters on each piece of responding fire apparatus.*

*It shall be the sole discretion of the City to determine the number and type of apparatus to be employed by the City as well as the number of fire companies and fire stations.* The Fire Chief in conjunction with appropriate staff and the Director of Public Works (City Engineer) shall evaluate all fire vehicles and related equipment. Recommendations on a long-term capital plan for vehicle maintenance and or replacement shall be made to the Mayor no later than August 1, 2002, for inclusion in the City's 2003 Capital Plan/Budget.

The Fire Chief in conjunction with appropriate staff, the Director of Inspection and Licenses, and the Director of Public Works shall review each fire station in order to determine what repairs and/or improvements are needed. Recommendations for immediate repairs shall be made no later than August 1, 2002, for inclusion in the City's 2003 Capital Plan/Budget. Long-term recommendations dealing with overall structural improvements for each station shall be made to the Mayor no later than August 1, 2003 for inclusion in the 2004 Capital Plan/Budget.

R.R. at 197a–99a (emphasis added).

### ii. Contentions

Fire Fighters argue the *"Fire Fighter Safety"* provisions compare favorably to the Recovery Plan provisions.

The City's argument on how the award violates the 2002 Recovery Plan is set forth in Appendix B to its Brief, and at times the argument is difficult to follow. The City apparently argues the *"Fire Fighter Safety"* provision of the award violates the 2002 Recovery Plan in various ways. First, it violates the *"Elimination of Minimum Manning"* requirement of Section II–B (7) of the Plan. Second, because the award does not allow the City to exclude the Deputy Chief from the bargaining unit, it violates Section II–B (2) of the Provisions Specifically for the Fire Department, titled *"Management Positions."* Third, to the extent the award does not allow the City to establish changes in employee duties or in scheduled assigned work, it violates Section II–B (1), titled *"Management Rights,"* and Section II–B (1) of Provisions Specifically for the Fire

Department, titled *"Organization and Scheduling."*

Further, the City acknowledges that the award allows it to implement a "three shift" schedule and reduces the maximum amount of personnel on holiday or vacation leave. However, the City complains that the award fails to follow the *"Paid Leave"* provisions in Section II–B (4) of the Plan [17] because it does not mandate that vacation time be earned on an accrual basis or limit carryover leave.

### iii. Management Positions, Paid Leave

 After careful review of the parties' arguments, of the award, and of the Recovery Plan provisions at issue, we agree with the City in part that the award violates clear, specific provisions of the Recovery Plan. The award does not allow the City to exclude the Deputy Chief from the bargaining unit, contrary to Section II–B (2), Provisions Specifically for the Fire Department (*"Management Positions"*). Additionally, the award violates Section II–B (4) of the Recovery Plan (*"Paid Leave"*) by not requiring that vacation time be used in the year earned or, under some circumstances, three months thereafter, and limiting carryover leave to the first three months of the subsequent year. The common pleas court orders are modified to expressly require award compliance with the Recovery Plan in these matters.

17. Section II–B (4) of the 2002 Recovery Plan, titled *"Paid Leave,"* provides in material part (R.R. at 191a–92a) (emphasis added):

> Annual vacation shall be scheduled and used during the year for which it is earned. If due to operational reasons, emergencies, and/or scheduling difficulties, leave cannot be used within this time period, said leave may be carried forward into the next calendar year for a period of three (3) months. Carryover leave not used within the first three (3) months of the subsequent year

We reject Fire Fighters' argument that the *"Management Positions"* and *"Paid Leave"* provisions of the 2002 Recovery Plan lapsed at the end of 2005. There is nothing in the plain language of the provisions supporting that contention.

### iv. Minimum Manning

 We reject part of the City's position on minimum manning. The *"Elimination of Minimum Manning"* requirement of the 2002 Recovery Plan addresses the "one hundred fifty fire fighter 'floor,' regarding the entire workforce complement," which existed in the previous CBA but was deleted from the contract by the award. R.R. at 26a; *see* R.R. at 704a. Also, the Recovery Plan provides in pertinent part that "the City shall provide for a minimum of three firefighters on each piece of responding fire apparatus." R.R. at 198a. This later provision of the Recovery Plan allows a minimum manning of responding equipment. Paragraphs 4(1), (2), and (3) of the award are consistent with this Recovery Plan provision.

Nevertheless, Paragraph 4(4) of the award is inconsistent with the Recovery Plan, as it requires five personnel to operate the equipment at issue. Also, a clause in Paragraph 4(5) permits the minimum manning of equipment to increase from three to four in certain circumstances, and this clause violates the Recovery Plan, Sections II–B (7) and II–B (1), Provisions

> shall be lost. In order for an employee to carry over leave, the written approval of the respective department head and the Director of Human Resources shall be required. The Director of Human Resources in consultation with the department heads shall establish standards and guidelines for granting such approval.

This provision was described in testimony before the arbitration panel. R.R. at 403–04a, 408–09a.

Specifically for the Fire Department. These Recovery Plan provisions have no obvious limitation on duration. Accordingly, the common pleas court orders are modified to expressly require that award Paragraph 4(4) and the offending clause of (5) conform to the Recovery Plan.

### v. Managerial Rights

■ We agree with the City's position on management rights. The award does not permit the City to determine and change job duties for each position, to determine and change schedules for each employee, and to assign work to any employee, as expressly required by Section II–B (1) of the 2002 Recovery Plan ("*Management Rights*"). This Recovery Plan provision contains no express limitation on duration. The operative language from this provision is added to the award.

We reject Fire Fighters' arguments that inclusion of this language essentially eliminates collective bargaining. There is no doubt that the Recovery Plan provisions impact the terms over which Fire Fighters can bargain; however, the Plan's recommendations are considered mandatory. *FOP v. Yablonsky* (legislature gave bargaining units the power to continue to be protected by the provisions of Act 111, but only to the extent the bargaining does not interfere with terms of recovery plan; bargaining rights bestowed by legislature may be limited or revoked by it); *see Wilkinsburg*, 535 Pa. at 435, 636 A.2d at 139 (even if section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards it would not violate the Pennsylvania Constitution). Moreover, Section 241 of Act 47 specifically authorizes recovery plan provisions involving "permanent and temporary staffing level changes or changes in organization." 53 P.S. § 11701.241(3).

### e. Other Provisions of Recovery Plan Not Adopted

Fire Fighters argue in support of the panel majority's broad refusal to adopt other provisions of the 2002 Recovery Plan into the award. They assert the City's position essentially eliminates collective bargaining and allows a distressed municipality to unilaterally dictate the terms and conditions of employment.

The City complains that the award violates the 2002 Recovery Plan by failing to incorporate the following provisions of the Plan:

- Section II–B (6), titled "*Regular Part-time Employees;*"
- Section II–B (8), titled "*Clothing Allowance;*"
- Section II–B (9), titled "*Longevity;*"
- Section II–B (10), titled "*Elimination of Subcontracting Clauses;*"
- Section II–B (11), titled "*Duplication of Benefits;*"
- Section II–B (12), titled "*Sick Leave/Doctors Evaluation;*"
- Section II–B (13), titled "*Family Medical Leave Act;*"
- Section II–B (14), titled "*Short-term Disability Insurance;*"
- Section II–B (15), titled "*Workers' Compensation;*"
- Section II–B (16), titled "*Elimination of Past Practices;*"
- Section II–B (17), titled "*Grievance Procedures;*"
- Section II–B (18), titled "*Drug and Alcohol Testing;*"
- Section II–B (19), titled "*Modified Duty;*"
- Section II–B (20), titled "*Absence Report;*" and
- Section II–B (21), titled "*Job Descriptions.*"

■ We conclude that the award violates the 2002 Recovery Plan by failing to include Sections II–B (6) and (8) through (21), inclusive. The Recovery Plan specifically states "to the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that the implementation of these cost containment provisions is mandatory." R.R. at 190a. Therefore, the common pleas court orders are modified to expressly include those provisions into the award.

We reject Fire Fighters' arguments that inclusion of these provisions essentially eliminates collective bargaining. There is no doubt that the Recovery Plan provisions have an impact on the terms over which Fire Fighters can bargain; however, the arbitration process is an adequate remedy. *FOP v. Yablonsky* (police union will not have ability to negotiate in the manner it would had no recovery plan been adopted, but arbitration process provides adequate remedy, based upon legislative intent in Act 47 to limit effect of bargaining on recovery plan provisions; rights the legislature bestows it may limit or revoke); *see Wilkinsburg*, 535 Pa. at 435, 636 A.2d at 139 (even if section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards it would not violate the Pennsylvania Constitution). Moreover, Section 241 of Act 47 specifically authorizes recovery plan provisions involving "[p]ossible changes in collective bargaining agreements. . . ." 53 P.S. § 11701.241(3).

### 3. Waiver by Failure to Raise Arguments

In their Reply Brief, Fire Fighters assert that the City left the arbitration panel in the dark regarding its position on many of the issues in the case, resulting in waiver of those arguments. Other than the charts appended to the City's Brief, Fire Fighters do not identify which arguments were not raised to the arbitration panel.

As this argument was raised in the Reply Brief, and no responsive brief from the City was permitted, there is no argument from the City on this point.

■ We reject Fire Fighters' position on waiver. The charts appended to the City's Brief, while not submitted to the arbitration panel, represent a summary or compilation of the essential points covered by voluminous evidence presented over an extended period of time. As an aide to appellate review, the charts are permissible. *See Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*, 587 Pa. 236, 269, 898 A.2d 590, 610 (2006) (reference to extensive appendix to appellate brief summarizing evidence); Pa. R.A.P. 2117(c) (Statement of Case—Statement of place of raising or preservation of issues; where portions of record are voluminous, they shall be included in an appendix); *see also DeBald v. McCarthy*, 87 Pa. Cmwlth. 408, 487 A.2d 460 (1985) (summary of computations of police officer overtime properly admitted); Pa. R.E. 1006 (Summaries).

■ Regarding the suggestion that some unspecified arguments were waived by failure to raise them before the arbitration panel, Fire Fighters do not develop this argument sufficiently for appellate review. Therefore, it is waived. *Condemnation of Land for South Central Bus. Dist. Redevelopment Area # 1 (405 Madison Street, City of Chester)*, 946 A.2d 1154 (Pa.Cmwlth.2008); *Am. Rock Mechs., Inc. v. Workers' Comp. Appeal Bd. (Bik & Lehigh Concrete Techs.)*, 881 A.2d 54 (Pa. Cmwlth.2005).

Further, it is clear that the City relied on all the provisions of the 2002 Recovery

Plan during the arbitration process. The City did not know the provisions of the award before it was issued. The City advanced its specific contentions of divergence at the earliest possible time through its prompt application for relief to the common pleas court. Under these circumstances, Fire Fighters' waiver argument lacks merit.

## D. Illegality of Recovery Plan

Fire Fighters assert the 2002 Recovery Plan is illegal and therefore unenforceable, based on several theories.

### 1. State Adverse Interest Act

Section 3 of the State Adverse Interest Act [18] provides: "No State advisor or State consultant having recommended to the State agency which he serves, either the making of a contract or a course of action of which the making of a contract is an express or implied part, shall, at any time thereafter, have an adverse interest in such contract." Fire Fighters contend that the Act 47 Coordinator violated this provision because since 2002 it has continued to collect significant fees as a direct result of its recommendation to DECD that the City remain in distressed status. Without reference to any authority to support this remedy, Fire Fighters assert the 2002 Recovery Plan is tainted beyond reclamation, rendering the Plan void *ab initio*.

Anticipating the City's arguments, Fire Fighters seek to distinguish this Court's decision in *FOP v. Yablonsky*, which rejected the argument that a distressed municipality's recovery plan is invalid because Act 47 coordinator violated State Adverse Interest Act. Fire Fighters highlight different facts: Act 47 Coordinator here rec-

ommended continuation of distressed status over a prolonged period, while in *FOP v. Yablonsky* the Act 47 coordinator did not participate in a determination of distressed status.

The City raises several points in defense on this issue. First, the City contends the issue is beyond the matters to be reviewed under narrow *certiorari*. Second, the City argues Fire Fighters are not aggrieved by the relationship between DCED and the Act 47 Coordinator; accordingly, they lack standing to bring the claim. Third, the City challenges whether Fire Fighters stated a claim under the State Adverse Interest Act, citing *FOP v. Yablonsky* and *Fire Fighters v. Yablonsky*. Fourth, the City points out that the State Adverse Interest Act imposes criminal penalties and has no provision for the declaratory relief Fire Fighters seek here.

■ We conclude that *FOP v. Yablonsky* controls this issue and commands rejection of Fire Fighters' challenge based on the State Adverse Interest Act. The factual distinctions raised by Fire Fighters are immaterial. Further, there is no provision in the State Adverse Interest Act which permits the remedy Fire Fighters seek.

As a broader concern, we question whether review of an interest arbitration award is the appropriate manner for resolving the purported illegality of an Act 47 recovery plan. This is because many affected parties, such as other unions and municipal bond holders, have no opportunity to participate.

### 2. Recovery Plan Conflict with Act 111

■ In an argument primarily raised in rebuttal,[19] Fire Fighters assert that the

---

18. 71 P.S. § 776.3.

19. The argument was first mentioned in note 17, page 54 of Fire Fighters' Brief, consisting of three sentences.

2002 Recovery Plan is illegal because the "*Management Rights*" provision, removes mandatory subjects of bargaining guaranteed by Section 1 of Act 111, 43 P.S. § 217.1, read in *pari materia* with the Pennsylvania Labor Relations Act.[20] They cite various cases which do not involve a distressed municipality under Act 47.[21] Also, illegality of the Recovery Plan is premised on the "*Health Insurance Benefits*" provision, which Fire Fighters allege improperly effects a change in health care costs for existing retirees. They rely on another case which does not involve a distressed municipality under Act 47.[22] Additionally, they reference the "*Regular Part-time Employees*" provision of the 2002 Recovery Plan,[23] arguing that by conferring sole discretion in the City, it eradicates bargaining over starting wages and duties of such employees.

Fire Fighters stress that these provisions of the 2002 Recovery Plan go beyond the limitations on bargaining tolerated under *Wilkinsburg*. Instead, the referenced provisions eliminate bargaining altogether.

As this issue was primarily addressed in Fire Fighters' reply brief, no response was made by the City.

For the most part, we reject Fire Fighters' arguments on this issue, for reasons previously discussed. *FOP v. Yablonsky* (police union will not have ability to negotiate in the manner it would had no recovery

---

**20.** Act of June 1, 1937, P.L. 1168, 43 P.S. §§ 211.1–211.13.

**21.** *Indiana Borough v. Pa. Labor Relations Bd.*, 695 A.2d 470 (Pa.Cmwlth.1997); *City of Bethlehem v. Pa. Labor Relations Bd.*, 153 Pa.Cmwlth. 544, 621 A.2d 1184 (1993); *Twp. of U. Saucon v. Pa. Labor Relations Bd.*, 152 Pa.Cmwlth. 530, 620 A.2d 71 (1993). None of the cases deals with a distressed municipality or the impact of Act 47; accordingly, the cases are inapposite.

**22.** *Twp. of Wilkins v. Wage & Policy Comm. of the Wilkins Twp. Police Dep't*, 696 A.2d 917 (Pa.Cmwlth.1997) (municipality may not enter into agreement over rights of existing retirees because such individuals are no longer members of bargaining unit; arbitrators without jurisdiction to consider issue).

**23.** Section II–B (6) of the 2002 Recovery Plan, R.R. at 193a, provides:

*Regular Part-time Employees.* The City shall have the right to hire regular part-time employees. Regular part-time employees shall be used or scheduled in such a fashion so as to virtually eliminate the need for nonemergency overtime within the City. Regular part-time employees shall be part of the applicable bargaining unit, and regular part-time police and firefighters will be hired through Civil Service procedures. Regular part-time employees may be scheduled at any time but shall not be scheduled to work more than 35 hours per week (42 hours per week for firefighters), except for court time, training, and in cases of emergency. Regular part-time employees may be used to replace a full-time employee who is absent from work for any reason. In this regard, the City shall have the right to change the schedules of regular part-time employees, for any reason, or to use regular part-time employees as "on call" replacements for full-time employees.

The City shall have the right, in its sole discretion, to determine the starting wages and job duties of regular part-time employees. Thereafter, regular part-time employees shall receive the same percentage increase to their hourly wage, if any, as full-time employees within the same bargaining unit. The City shall not hire regular part-time employees which would displace any existing full-time employees. Qualified part-time employees shall be considered for full-time positions which the City decides to fill through the job posting procedure. In cases of layoffs, all regular part-time employees within a job classification shall be laid off first, according to their reserve seniority, before full-time employees are laid off within the same job classification.

Regular part-time employees shall not be eligible for any form of employee benefits or paid leave.

This Recovery Plan provision was the subject of testimony before the arbitrators. R.R. at 411a.

plan been adopted, but arbitration process provides adequate remedy, based upon legislative intent in Act 47 to limit effect of bargaining on recovery plan provisions; rights the legislature bestows it may limit or revoke); *see Wilkinsburg*, 535 Pa. at 435, 636 A.2d at 139 (even if section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards it would not violate the Pennsylvania Constitution); Section 241(3) of Act 47, 53 P.S. § 11701.241(3) (recovery plan may include "[p]ossible changes in collective bargaining agreements and permanent and temporary staffing level changes or changes in organization").

There is merit in part of Fire Fighters' arguments, however. We question the legality of retroactive changes in health benefits for those fire fighters who retired during this prolonged litigation. Therefore, the cessation of health care benefits shall not be retroactive; rather, the cessation of health care benefits shall apply to those retiring after the effective date of this Court's Order expressly modifying the common pleas court orders to expressly incorporate the 2002 Recovery Plan provision into the award. This is consistent with the prospective language of the Recovery Plan provision on the subject.

### E. Preclusion by Conduct

Fire Fighters highlight conduct by the City which impacts enforceability of the 2002 Recovery Plan and the City's right to challenge the award.

 Fire Fighters assert the City acted in a manner inconsistent with the 2002 Recovery Plan. They argue that the City used an otherwise-ignored Recovery Plan as a shield to avoid its statutory collective bargaining obligations and as a sword to achieve that which it could not obtain at the bargaining table. Without citation to authority, Fire Fighters contend that by this conduct the City is precluded from asserting the Recovery Plan.[24]

The City responds that judicial review is limited to whether the award violates the mandatory provisions of the 2002 Recovery Plan. The narrow *certiorari* review cannot be expanded to include issues unrelated to the particular CBA in question. The City cites *Washington Arbitration Case* and *City of Farrell* for the position that there is limited jurisdiction in the nature of narrow *certiorari* to review propriety of arbitrators' exercise of their powers.

An argument similar to the one advanced by Fire Fighters here was raised by the fire fighters in *Borough of Greenville*. It was rejected by the trial court and, on appeal, by this Court. *See Borough of Greenville*, 952 A.2d at 702 (adopting lower court analysis); *id.* at 705 (Leavitt, J., concurring and dissenting; separately addressing fire fighters' preclusion argument). Rejection of the preclusion argument here is consistent with this recent decision. It is also consistent with the limited scope of judicial review, which here is focused on the propriety of the arbitrators' exercise of their powers.

### V. Conclusion

For all the reasons discussed, we affirm as modified, consistent with the foregoing opinion.

---

24. In addition, Fire Fighters briefly argue that because the City bargained over provisions of the award now being challenged, it waived the right to complain about those award provisions. Fire Fighters concede there is no record on this issue. Appellant's Br. at 32, n. 7.

We reject this argument. We are unaware of any authority holding that by bargaining with a union a public employer relinquishes its ability to challenge an arbitrator's actions. Fire Fighters fail to bring any such authority to our attention.

## *O R D E R*

**AND NOW,** this 23rd day of January, 2009, the orders of the Court of Common Pleas of Lackawanna County, entered October 23, 2007 and January 15, 2008, are **AFFIRMED as MODIFIED.** In particular, the arbitration award effective May 30, 2006, is modified as follows (with deletions stricken and additions underlined):

1. *Term.*

The modified contract shall be for a term of five years, starting on January 1, 2003 and continuing through December 31, 2007. This terms [sic] coincides with the term awarded by the Act 111 Panel in resolving a similar bargaining impasse between the City and E.B. Jermyn Lodge 2, of the Fraternal Order of Police ("the Police Award"). If, while this modified contract controls the relationship between the parties, the 2002 Recovery Plan is amended to allow some or all of the provisions of the original award, those provisions shall be reinstated as of the effective date of the amendment.

2. *Wages.*

Within 45 days of the execution of this Award by at least a majority of the Panel, all bargaining unit members who are on the payroll on the corresponding dates listed below shall receive wage increases of bonuses in accordance with the following:

| | |
|---|---|
| January 1, 2003 | $1000 lump sum bonus. |
| January 1, 2004 | $1000 lump sum bonus. |
| January 1, 2005 | $1250 lump sum bonus. |
| December 31, 2005 | 5.5% increase across the board. |
| January 1, 2006 May 30, 2006 | 3.5% increase across the board. |
| January 1, 2007 | 4.0% increase across the board. |

The Panel notes these increases are the same as awarded in the Police Award and a majority of the Panel believe that these increases do not exceed the increase in costs permitted under Chapter II–B of the Plan.

3. *Health Insurance.*

A. The City is ordered to fully cooperate with the Health Care Committee by providing all information reasonably necessary to its function and by cooperating with the National Health Care Consultant in the Committee's efforts to contain health care costs.

B. Effective 30 days after the issuance of this award, the applicable deductibles and/or copayments shall be adjusted as follows:

1. The maximum individual annual deductible under the medical insurance plan shall be increased from $200 to $400 for in-network and out-of-network.

2. The maximum family annual deductible shall be increased from $400 to $800 for in net work and out-of-network.

3. The per-visit emergency room co-pay shall be increased from $35 to $75.

4. The per-visit doctor co pay shall be increased from $5 to $10.

5. The co-payment for the prescription plan shall be increased to $6 for generics and $15 for brand name drugs.

C. Article XV, Sections 3(A) and (B) of the collective bargaining agreement shall be amended as follows:

1. Effective January 1, 2003, the City shall be liable for the cost of health insurance (over and above the listed deductibles and co-payments) up to the annual amounts listed below:

| | |
|---|---|
| Single Coverage | $3,692 |
| Parent/Child | $7,298 |
| Parent/Children | $7,869 |
| Husband/Wife | $9,261 |
| Family | $9,933 |

2. As of January 1, 2004, the City shall be responsible for 50% of any increases in the cost of health care for active bargaining unit employees be-

yond that provided above and the active employees shall be responsible for the balance of any subsequent increases as determined by the healthcare provider.

D. Retiree Health Insurance shall be amended as follows: ~~Effective January 1, 2007, all bargaining unit members who thereafter retire and are eligible to receive retiree health insurance under the 1996-2002 Agreement shall continue to be eligible to receive insurance for a period of 5 years following the bargaining unit member's retirement.~~ <u>Effective January 23, 2009, the City will cease to extend health care benefits to employees who retire on or after that date.</u> The Panel notes that these provisions are congruent with the health care provisions in the Police Award. Further, a majority of the Panel believes that the record does not indicate the above provisions will violate the City's maximum health care costs permitted by Section II–B of the Plan.

### 4. *Fire Fighter Safety*

In recognition that the one hundred fifty fire fighter "floor," regarding the entire workforce complement, in the previous contract cannot be continued without concurrence by the City and in recognition of the City's decision not to so concur, the Panel acknowledges that the "floor" will be deleted from the contract. As implied above, a majority of the Panel is convinced from the evidence of record that there is a direct and irrefutable connection between the lives and safety of the fire fighters and the number of personnel actually assigned to fire apparatus that the City determines to operate. In that regard, it would appear that the NFPA 1710 standards developed by a nationally-renowned body of experts to which the City belongs provides the scientifically-sound and persuasive guidance on this vital issue. As further indicated above, the Panel recognizes that the City's finances and the terms of the Plan cannot achieve the NFPA standards in their entirety.

Accordingly, the Panel directs the following as being the minimal necessary staffing to protect the safety and lives of the bargaining unit:

Effective immediately, the portion of Article XIX, Section 3 of the collective bargaining agreement that provides "Except as otherwise provided in this Agreement, the bargaining unit complement shall at all times be maintained at not less than One Hundred Fifty (150) bargaining unit members" shall be deleted and shall be replaced with the following language:

1. Each engine company maintained by the City shall be actually staffed on each shift with no less than three (3) personnel.

2. Each truck company maintained by the City shall be actually staffed on each shift with no less than three (3) personnel.

3. The Rescue Unit shall actually be staffed on each shift with no less than three (3) personnel.

4. If the City determines to utilize an apparatus as a Quint (a combination ladder and engine apparatus) and merges into a single engine company and single truck company into one Quint company, it shall actually be staffed with no less than ~~five (5) personnel,~~ <u>such personnel as the City shall, after consultation with the fire fighters, in its discretion determine. In making this determination the City shall not unreasonably or arbitrarily endanger the safety or health of bargaining unit members.</u>

5. The number of pieces of apparatus and fire companies maintained by the City is left to its discretion. ~~However,~~ If the City temporarily or permanently closes more than three companies at the same time, the minimum manpower per apparatus provided above ~~shall~~ may be increased for engines, trucks and Rescue from three to four personnel, as the City in its discretion shall determine after consultation with the fire fighters. In making this determination the City shall not unreasonably or arbitrarily endanger the safety or health of bargaining unit members. Although nothing in this provision shall nullify the City's obligation to pay overtime, this provision is neither intended to create overtime or any other additional costs to the City. Rather, the sole purpose of this provision is to ensure that there is a safe level of manning at fires if the City temporarily or permanently closes more than three fire companies, and the provision is not intended to create a minimum number of fire fighters in the bargaining unit or require the City to hire additional fire fighters. Should the parties not agree on whether the City has closed a company, the panel named above shall make a determination whether it has been closed or not.

6. To accomplish the foregoing and to minimize the impact upon the City's finances, it is imperative that as many personnel as possible be assigned to fire suppression. Therefore, the Master Mechanic position may be eliminated and the personnel in that position will assume fire fighting suppression responsibility. Further, the City shall have the right to implement a "three-shift" schedule in which firefighters engaged in fire suppression would work twenty-four hours followed by forty-eight hours off. All regularly scheduled hours of work required by such schedule shall be paid at the hourly straight-time rate. By the use of "Kelly Days" and an appropriate work cycle under the Fair Labor Standards Act (FLSA) this schedule will not generate overtime under the Collective Bargaining Agreement or the FLSA to the extent it and its regulations apply to municipal fire departments.

7. If the foregoing staffing is maintained, the maximum amount of personnel on leave (holiday and vacation leave) will be reduced from 4 to 3 on a holiday and from 5 to 4 on vacation.

5. New Provisions

1. Sections II–B (6), and (8) through (21), inclusive, of the 2002 Recovery Plan are incorporated by reference into this modified award.

2. The City shall have the right, after consultation with the fire fighters, to determine the organizational structure and operation of each Department including, but not limited to, the right to determine and change job duties for each position, the right to determine and change schedules for each employee, and the right to assign work to any employee. In the exercise of this right, the City shall not unreasonably or arbitrarily endanger the safety or health of bargaining unit members.

3. The City shall file a unit clarification petition with the Pennsylvania Labor Relations Board in order to exclude the Chief, Deputy Chief, Administrative Captain and Assistant Chiefs from the bargaining unit, if necessary.

4. Annual vacation shall be scheduled and used during the year for which it is earned. If due to operational reasons, emergencies, and/or scheduling

difficulties, leave cannot be used within this time period, said leave may be carried forward into the next calendar year for a period of three (3) months. Carryover leave not used within the first three (3) months of the subsequent year shall be lost. In order for an employee to carry over leave, the written approval of the respective department head and the Director of Human Resources shall be required. The Director of Human Resources in consultation with the department heads shall establish standards and guidelines for granting such approval.